# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSE ENRIQUE CASTILLO CHAIDEZ, : | |
|     Plaintiff, : | CIVIL ACTION |
| v. : | No. 18-1837 |
| : | |
| CARL HEMPHILL, ET AL. : | |
|     Defendants. : | |

McHUGH, J.                                                                                    NOVEMBER 15, 2019

### MEMORANDUM

This is a case rooted in allegations of labor trafficking where the issue presently before the Court is whether a release between the parties bars the Plaintiff's claims, or is unenforceable on grounds of unconscionability. Plaintiff Jose Enrique Castillo Chaidez, a Mexican national, has sued under the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1581-97, and the corresponding Pennsylvania anti-human trafficking law, known as Act 105, 18 Pa. C.S. §§ 3001-72.[1] He was recruited by Defendant Carl Hemphill to work for his trucking company through the H-2B temporary guest-worker visa program. Castillo alleges that, in the course of his employment, Defendants Carl and Mariana Hemphill mistreated him by directing him to undertake activities that went well beyond the scope of his agreed upon job responsibilities, wrongfully withholding money that he was entitled to, lodging him in overcrowded and unsanitary housing, and threatening him with arrest and permanent expulsion from the H-2B program if he refused to acquiesce to these conditions. In their Motion for Summary Judgment, Defendants do not address the merits of Castillo's allegations, but rather make two threshold

---

[1] Plaintiff also brings contract claims and claims under state and federal employment law and consumer protection statutes.

1

arguments: (1) that Castillo's claims against Carl Hemphill and KAH Transportes are barred by a mutual release agreement signed by Castillo and Carl Hemphill months after the end of their employment relationship, and (2) that Castillo has not demonstrated a sufficient factual basis to support a finding of liability for Mariana Hemphill or the other Hemphill business entities.

Looking at the record in the light most favorable to Castillo, the non-moving party, I find that there are genuine disputes of material fact as to whether the mutual release agreement is enforceable because of unconscionability. Furthermore, there are genuine disputes of material fact as to whether the related Hemphill and corporate Defendants may be liable for the harms alleged by Castillo. Defendants' Motion will be denied accordingly.

I. **Relevant Background**

Carl Hemphill exercises control over a number of companies involved in landscaping, with an emphasis on the sale and transportation of mulch. These companies all operate out of one shared address, 1720 South State Road, Upper Darby, PA. Carl Hemphill is the sole owner of KAH Transportes, President of Operations of Three Seasons, and an officer at Delco Mulch and Supply and MJC Labor Solutions. C. Hemphill Dep. I at 29:13-17, 30:2-6, 33:15-23, Pl.'s Ex. 3, ECF 29-3. Mariana Hemphill is the owner of Three Seasons but does budget reconciliations for all of the above companies. C. Hemphill Dep. I at 30:7-10; Ma. Hemphill Dep. 58:19-59:4, Pl.'s Ex. 11, ECF 29-3. Gabriela Orozco is employed by all four companies as an office manager, and all four companies use the same phone number and credit card. Orozco Dep. 34:3-13, 115:19-24, 123:10-22, Pl.'s Ex. 9, ECF 29-3. One of those companies, KAH Transportes, hauls mulch on behalf of its customers, which include some of the other companies managed by Carl Hemphill, such as Delco Mulch. C. Hemphill Dep. I at 37:10-39:16.

In 2015, Carl Hemphill successfully applied for three H-2B visas in order to hire temporary guest workers to be employed at KAH. C. Hemphill Dep. I at 126:7-10. Carl

Hemphill travelled to Culiacan in Sinaloa, Mexico in early 2015 to recruit workers to fill the positions. C. Hemphill Dep. I at 126:19-127:3. While in Sinaloa, Carl Hemphill met Castillo at a job fair and offered him one of the open positions at KAH, which Castillo accepted. C. Hemphill Dep. I at 126:16-17; Pl.'s Dep. 11:17-22, Pl.'s Ex. 1, ECF 29-3.

Tensions between the parties began shortly after Castillo was hired at the fair. Castillo's purported understanding after the job fair was that he would be flown by the Defendants to the United States shortly after he received his visa, which he was able to obtain on March 10, 2015, and that his contract would begin on March 5, 2015. Compl. ¶ 93, ECF 2; C. Hemphill Dep. I at 136:20-137:7, 140:24-141:13; Pl.'s Ex. 4, ECF 29-3. There was ultimately over a month-long gap between Castillo securing his visa, however, and Defendants' arranging his flight to the United States, leading Castillo to take out loans to cover his living expenses for the interim period.[2] Defendants ultimately secured a flight for Mr. Castillo into the United States arriving on April 19, 2015. Pl.'s Ex. 10, ECF 29-3.

Upon arriving at Philadelphia International Airport, Castillo was picked up by Carl Hemphill and taken to KAH's headquarters at 1720 South State Road. Castillo alleges that Mariana Hemphill was there and confiscated his passport; when his Social Security card arrived days later, the Employer Defendants allegedly held on to that as well.[3] Pl.'s Dep. 84:6-19, 85:2-9. Castillo did not receive his first paycheck for nearly a month into the job, further placing him

---

[2] The parties dispute whether Carl Hemphill offered to pay for Castillo's airfare to the United States, though both Mariana Hemphill, Carl's wife and business partner, and Gabriela Orozco, one of Carl's employees, testified that Carl's businesses would routinely pay for guest workers' transportation from abroad. Orozco Dep. 147:15-148:2; Ma. Hemphill Dep. 82:2-16. Defendants deducted the cost of airfare from Castillo's wages. Pl.'s Ex. 21 at 000003, 5, ECF 29-4; C. Hemphill Dep. I at 191:19-192:13.

[3] The parties dispute whether these confiscations occurred. Both Mariana Hemphill and Gabriela Orozco deny it.

3

in debt.[4]  When he finally did receive his initial paycheck, Castillo alleges that he was not compensated for his first three days of work while he was being trained on his driving routes. Pl.'s Dep. 19:7-23; Asencio Dep. 18:7-19:3, Pl.'s Ex. 19, ECF 29-4.  In his complaint and deposition, Castillo details long work days, in which he was not only required to haul materials for KAH but engage in other kinds of manual labor for Defendants and their business interests without compensation, such as cleaning trash in the yard, laying concrete, and building furniture for Defendants.  Pl.'s Dep. 43:19-45:12, 47:12-25.  Carl Hemphill contends that Castillo's responsibilities were limited to truck transportation.  C. Hemphill Dep. I at 179:23-180:12.

Castillo was also distressed by his housing conditions.  As a part of their contractual agreement, Carl Hemphill had agreed to provide housing for Castillo, with rent being deducted directly from Castillo's wages.  Pl.'s Dep. 38:21-39:4; Pl.'s Ex. 6 at ¶ B, ECF 29-3.  According to Castillo, the house that Carl Hemphill provided to him was in bad enough shape to appear "abandoned."  Pl.'s Dep. 111:25.  More specifically, Castillo alleges that there was sufficient mold and dirt in the bathroom that he put plastic over his feet when showering to avoid infection; the apartment was overcrowded; Castillo's mattress was overrun with bedbugs; and there were rats and cockroaches in the kitchen.  Pl.'s Dep. 111:23-112:14.  Castillo reportedly complained to Carl and Mariana Hemphill about the conditions multiple times throughout the course of his employment, but according to him no remedial action was taken by the Defendants.  Pl.'s Dep. 22:4-7.

Finding himself subject to significantly more difficult living, working, and financial conditions than he had anticipated, Castillo decided it would be best to return to Mexico.

---

[4] One worker testified that it is standard practice for the Defendants to withhold employees' first week's wages and then pay the employees those wages in December as a "backup" when there is less work. J. Cruz Dep. 49:12-52:2, Pl.'s Ex. 12, ECF 29-3.

Castillo expressed this desire to return to the Defendants but was allegedly warned that he would suffer negative consequences if he chose to leave. For instance, Mariana Hemphill reportedly told Castillo that he "could get in trouble with the police" if he did not remain for the duration of his contract, which was supposed to last through December 2015. Pl.'s Dep. 113:24-114:7. She also allegedly stated she would "close the door" to his participation in the H-2B visa program in the future. Pl.'s Dep. 61:4-20. Castillo contends he took these threats seriously, particularly since his coworkers informed him that Mariana Hemphill had previously worked at the Mexican consulate and continued to have influence with them. Pl.'s Dep. 61:22-62:3. Castillo was also told that other employees had been arrested when they tried to leave. Pl.'s Dep. 62:8-63:9.[5]

Castillo maintains that he continued to work for Defendants due to his fear of reprisals, but eventually found the situation untenable. On July 9, 2015, Castillo called the Human Trafficking Hotline for help. Pl.'s Ex. 23, ECF 29-4. The following day, Castillo went to the office to pick up what would be his last paycheck. What happened next is hotly disputed by the parties. Castillo says he was given his passport and Social Security card by Gabriela Orozco, the office manager, and instructed to wait for Carl Hemphill in order to receive his paycheck. Answer ¶¶ 233-35, ECF 5; Pl.'s Dep. 115:3-17. When Carl Hemphill arrived, he refused to provide Castillo his paycheck and then called the police on Castillo. Answer ¶ 247; C. Hemphill Dep. I at 226:9-229:5. Carl Hemphill testified that, to the contrary, Castillo became aggressive toward him and told him that he would "pay in blood" for his failure to produce the paycheck. C. Hemphill Dep. I at 228:7-229:5. Regardless of which version of events one adopts, it is

---

[5] One other co-worker, Arnaldo Asencio, has testified that workers were generally fearful of speaking out against the Hemphills for fear of suffering punitive consequences. Asencio Dep. 45:16-46:22.

undisputed that the police eventually arrived and arrested Castillo, charging him with trespass and terroristic threats. Pl.'s Exs. 24-25, ECF 29-4, ECF 29-5; Pl.'s Ex. 20 at ¶ 20, ECF 29-4.

The affidavit of probable cause from the arresting officer reflects that when he arrived, he understood that Castillo was on the premises to collect his last paycheck, and there was a disagreement over whether he still had company property. According to Hemphill, Castillo still had access to a company truck and equipment. When the officer advised him that he must leave or be arrested, Castillo put out his arms and surrendered to the officer. Pl.'s Ex. 25. The affidavit further reflects that the officer personally witnessed no threat, and that Hemphill later went to the police to state Hemphill interpreted a Spanish expression Castillo had used as a threat on his life. A coworker helped to pay Castillo's $500 bail to release him from jail. Pl.'s Ex. 20 at ¶ 21.

Castillo did not return to Mexico upon being released, because he was still waiting on the final paychecks owed to him by Defendants and had been relying on that income to purchase his transportation. Pl.'s Dep. 114:8-12. He also wanted to resolve the criminal charges pending against him. If he left the country before the completion of the criminal process, Castillo was afraid he would not be able to participate in the H-2B program going forward nor resume his prior cross-border trucking work in Mexico. Pl.'s Dep. 114:8-115:2. It seems clear that Castillo did not receive the money owed to him by Defendants until October 14, 2015, the day of his criminal hearing, when he signed the release agreement with Carl Hemphill. Ex. 8 to Def.'s MSJ at ¶¶ 1, 4, ECF 27; C. Hemphill Dep. I at 264:16-266:14. In the interim period, Castillo had left 6335 Vine Street and moved in with a member of the community, collecting scrap metal in order to make ends meet. Pl.'s Dep. 88:4-7, 116:9-18.

The release was prepared by Hemphill's counsel. C. Hemphill Dep. I at 264:6-11. It required Castillo to agree that he had "voluntarily" withdrawn from employment and could not claim unemployment compensation or sue for wrongful termination. Hemphill agreed to pay the wages he owed. Hemphill agreed to advise the District Attorney that he "had no interest" in seeing Castillo prosecuted, with the understanding that only the District Attorney could drop the charges. And Hemphill tendered formal notification to the Department of Labor that because Castillo was no longer employed, he must leave the United States.

After entering into the agreement with Hemphill, Castillo's terroristic threat charge was withdrawn. But to avoid a conviction on the trespass charge, Castillo entered the Court's Accelerated Rehabilitative Disposition (ARD) Program. He was required to complete 12 months of probation (including monthly probation fees), 32 hours of community service, pay $1532 in court costs and $200 in restitution. Pl.'s Ex. 26, ECF 29-5; C. Hemphill Dep. I at 279:7-280:17; Pl.'s Dep. 117:11-118:3. Castillo claims that Carl Hemphill continued to harass and intimidate him after the agreement was signed, asking co-workers about his whereabouts; requesting and receiving confidential information from the Mexican Consulate about his passport renewal; contacting law and immigration enforcement regarding Castillo; and monitoring a witness's house and taking photos to forward to immigration authorities. Asencio Dep. 10:19-20, 11:7-17, 54:22-55:20; Pl.'s Ex. 27 at No. 6, ECF 29-7; C. Hemphill Dep. I at 258:20-260:11; C. Hemphill Dep. II at 95:11-98:15, 76:9-83:9, Pl.'s Ex. 16, ECF 29-4. Castillo applied for and received a T-visa, available to certain categories of trafficking victims. *See* INA § 101 (a)(15)(T); 8 U.S.C. § 1101 (a)(15)(T); 8 C.F.R. § 214.11. Castillo brings this action to remedy the alleged harms caused by Defendants' behavior.

**II.     Standard of Review**

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

**III.    Discussion**

    **A.     Enforceability of the Contract**

Defendants assert that the October 14 mutual release agreement between Castillo and Carl Hemphill bars this suit. The release agreement provides in relevant part that "[n]o claims will be brought by either Employer or Employee, against the other party," referring to Carl Hemphill and Castillo, respectively. Ex. 8 to Def.'s MSJ at ¶ 4. In reply, Castillo contends that the mutual release agreement is unenforceable because (1) it is unconscionable and (2) against public policy.[6]

Pennsylvania law governs Plaintiff's state law claims, *Livingstone v. N. Belle Vernon Borough*, 91 F.3d 515, 523-24 (3d Cir. 1996) (*Livingstone II*). As a threshold matter, the Defendants argue that it would be inappropriate for me to consider evidence extrinsic to the terms of the agreement. But the Pennsylvania Supreme Court has held that "[t]he rule which forbids the introduction of parol evidence to contradict, add to, or vary a written instrument does not extend to evidence offered to show that the contract was made in furtherance of objects forbidden by statute, by the common law, or by the general policy of the law." *Bokser v. Lewis*, 119 A.2d 67, 70 (Pa. 1956) (citation omitted); *see also Kuhn v. Buhl*, 96 A. 977, 985 (Pa. 1916) ("Where a written instrument is attacked upon the ground that the contract is offensive to law and violative of public policy, the whole transaction should be inquired into, and the court will

---

[6] Defendants have not responded to either of Plaintiff's arguments.

not suffer itself to be embarrassed by any technical rules regarding the admissibility of evidence" (citation omitted)). Pennsylvania's approach to unconscionability is "largely consonant" with the Second Restatement of Contracts. *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007). Under the Restatement approach, although the unconscionability determination is made as a matter of law, it is made in "the light of all the material facts," and "the parties are to be afforded an opportunity to present evidence as to commercial setting, purpose and effect to aid the court in its determination." Restatement (Second) of Contracts § 208 cmt. f (1981).

        1.     *Unconscionability*

Under Pennsylvania law, the test for unconscionability has both substantive and procedural elements. *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 230 (3d Cir. 2012). "The Pennsylvania Supreme Court has indicated that "a 'sliding-scale approach'" may be employed "so that 'where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required' and . . . vice-versa." *Id.* at 230 (citing *Salley*, 925 A.2d at 119). "But while substantive and procedural unconscionability need not be present in *equal* amounts, both—in some amount—are necessary to invalidate an agreement." *Styczynski v. MarketSource, Inc.*, 340 F. Supp. 3d 534, 541 (E.D. Pa. 2018). Based upon my review of the terms of the agreement itself, I conclude that Castillo states a strong case as to the agreement's substantive unconscionability. Additionally, based on the factual record before me, there is sufficient evidence upon which a reasonable fact-finder could find the release procedurally unconscionable as well.

Substantive Unconscionability

The Third Circuit has defined substantive unconscionability as referring "to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party

9

does not assent." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999). The terms of the mutual release agreement between Castillo and Hemphill are grossly favorable toward Hemphill, particularly because there was little consideration provided to Castillo in return for his release of claims against Carl Hemphill.

The agreement, drafted by Hemphill's counsel, stated that neither Castillo nor Carl Hemphill would bring any claims against each other in the future. Based on the complaint before me, it is apparent that Castillo had several colorable claims against Carl Hemphill that he was required to waive, sounding in torts, contract, and employment law; Carl Hemphill has not identified any claims he might have contemplated bringing against Castillo. In exchange for giving up these potentially viable claims against Hemphill, Castillo only received two promises of minimal value aside from Hemphill's waiver of unspecified future claims against Castillo.

First, Hemphill agreed to pay Castillo $1,500 "in full payment of all wages, salaries and compensation due to employee." Ex. 8 to Def.'s MSJ at ¶ 2. But, the agreement on its face acknowledges that Carl Hemphill already had a pre-existing duty to pay Castillo for services rendered to him.[7] Under basic principles of contract law, this payment of wages already owed could not be sufficient consideration between the parties for executing the agreement. As provided by the Restatement (Second) of Contracts § 73 (1981):

> Performance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration.

Additionally:

> A claim that the performance of a legal duty furnished consideration for a promise often raises a suspicion that the transaction was gratuitous or mistaken or unconscionable.

---

[7] In fact, Castillo claims this represents only a partial sum of the wages due to him, Pl's Resp. to MSJ at 10, ECF 29, and records produced in discovery appear to lend support to that claim. Pl.'s Ex. 21, ECF 29-4.

Restatement (Second) of Contracts § 73 cmt. a (1981). Because Hemphill already owed Castillo these wages, there was no consideration for his promise to pay Castillo in exchange for the release agreement. If anything, the inclusion of this term is relevant to Castillo's contention that the agreement is substantively unconscionable. In that regard, as to the day of the confrontation between Hemphill and Castillo, if Hemphill is correct that Castillo still possessed company property, he could advance a reasonable business rationale for holding Castillo's wages until the property was returned. But there is no justification apparent from the record as to his continued refusal to tender the pay Castillo was admittedly owed up to the time of the criminal hearing almost three months later.

Second, Hemphill promised that he would recommend that all pending criminal charges stemming from the July 10 incident against Castillo be dropped. The agreement specifically stated that Carl Hemphill would:

> Advise the Office of the District Attorney of Delaware County that he has no interest in seeing Employee prosecuted for any offense which said Employee may have committed against him. Employee acknowledges that Employer has no control over the District Attorney's exercise of discretion, and cannot guarantee that his recommendation will be accepted by the District Attorney.

Ex. 8 to Def.'s MSJ ¶ 5. Unlike standard release-dismissal agreements between prosecutors and defendants, agreements that courts have subjected to immense scrutiny, this agreement did not and could not assure that Castillo would no longer face criminal charges. In fact, only one charge was dropped after the agreement was signed, and to avoid the threat of conviction, Castillo was required to fulfill the terms of the local Court's ARD program as described above. And although Hemphill recommended that criminal charges be dropped against Castillo, the agreement further stated that he would report to the Department of Labor that Castillo was no

11

longer employed by the Defendants so that he would need to subsequently leave the country. Ex. 8 to Def.'s MSJ ¶ 6.

In summary, Castillo received little, if anything, of value under the agreement, only: (1) an unenforceable promise to have criminal charges against him dropped; (2) payment of wages to which he was already entitled; and (3) the release of other unspecified claims Hemphill purportedly could have brought against him. In exchange, Castillo released all claims he had against Hemphill, several of which are colorable, including claims governed by the federal TVPA.

Under Pennsylvania law, "the ultimate determination of unconscionability is for the courts" rather than the jury. *Salley*, 925 A.2d at 120. This comports with the model set forth in § 208 of the Restatement (Second) of Contracts: "A determination that a contract or term is unconscionable is made by the court." Comment f. Here, because payment of wages owed cannot serve as consideration, and the provision concerning criminal prosecution is essentially illusory, the benefits of the agreement flowed almost exclusively to Hemphill. In its substance, I am persuaded that the agreement was unconscionable, a conclusion further supported by the Pennsylvania Superior Court's admonition that "agreements not to prosecute have been called emphatically illegal," because "it is an affront to our judicial sensibilities that one person's ability to seek another's prosecution can be bartered and sold the same as commodities in the market place." *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 144 (Pa. Super. Ct. 1985).[8]

### Procedural Unconscionability

Finding substantive unconscionability does not end the inquiry, as Pennsylvania law also requires some degree of procedural unconscionability to void a contract. "Procedural

---

[8] *Rawlinson* was cited with approval by the Third Circuit in *Livingstone II.* 91 F.3d at 540-41.

unconscionability pertains to the process by which an agreement is reached." *Harris*, 183 F.3d at 181. The guiding question of the analysis is whether "there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it." *Salley*, 925 A.2d at 119. If the context surrounding the acceptance of the challenged contract term was too coercive or unfair, it would be procedurally unconscionable to enforce the term against the compromised party. Necessarily, procedural unconscionability is a factually driven inquiry.

Most cases addressing procedural unconscionability arise in a commercial context, bearing little resemblance to the facts of this case. Here, because the release involved purported dismissal of criminal charges, it is instructive to look to the line of cases analyzing the circumstances under which release-dismissal agreements negotiated by prosecutors are determined to be valid and enforceable.[9] In *Town of Newton v. Rumery*, 480 U.S. 386 (1987), the Supreme Court set forth two requirements for release-dismissal agreements to be valid: they must be (1) voluntary and (2) not adverse to the public interest. *Id.* at 398. Justice O'Connor, in supplying the fifth vote for the majority, wrote a concurring opinion in which she cautioned that such agreements would need to be evaluated on a "case-by-case" approach, and more importantly, that she would place the "burden of those relying upon such covenants to establish that the agreement is neither involuntary nor the product of an abuse of the criminal process."

---

[9] Although the release is not exactly analogous to a prosecutorial release-dismissal agreement, they are similar insofar as both are designed to trade a defendant's prospective criminal liability for the opposing party's civil liability. As discussed below, courts have been concerned with the strong potential of abuse and coercion inherent with such agreements. It should also be noted that, in practical terms, the "meaningful choice" inquiry required under a procedural unconscionability analysis and the "voluntariness" inquiry required under the release-dismissal line of cases are highly similar.

*Id*. at 399 (O'Connor, J., concurring). This standard laid out by Justice O'Connor reflects an underlying concern that these agreements often are not entered into voluntarily by defendants.[10]

The Third Circuit further refined the voluntariness test established by *Rumery* in *Livingstone v. North Belle Vernon Borough*, 12 F.3d 1205 (3d Cir. 1993) ("*Livingstone I*"), and *Livingstone II*, *supra*. Relevant factors include (1) the length of discussion about the proposed agreement, (2) whether there was a clear on-the-record statement made before a judge reflecting the rights being waived by the plaintiff, (3) which party drafted the release-dismissal agreement, (4) whether the plaintiff had the ability to review the agreement, including the length of time the plaintiff had to consider the agreement and whether they consulted with counsel, (5) whether the plaintiff was incarcerated at the time of the agreement, and (6) whether the plaintiff clearly understood the terms of the agreement. *Furey v. Wolfe*, 2011 WL 6779302, at *4 (E.D. Pa. Dec. 27, 2011) (enumerating factors considered by *Livingstone I*).

On the record here, I am persuaded that the *Livingstone* standard provides the best matrix for evaluating procedural unconscionability. As a factual matter, the essence of the agreement between the parties is highly similar to agreements negotiated by prosecutors in securing release of claims against governmental officials and entities. As a policy matter, I return to the nature of Plaintiff's claims. Castillo contends in part that he was a victim of trafficking and under duress because of Hemphill's refusal to pay him. Under Pennsylvania's Act 105, retaining a worker's personal property—in this case his pay—subjects an individual to involuntary servitude. 18 Pa. C.S. § 3012(b)(5). The federal statute has similar provisions. 18 U.S.C. §§ 1589(a), 1595. The

---

[10] The second requirement established by *Rumery*, regarding whether the agreement is in the public interest or not, dealt specifically with the role of prosecutors. *See Cain v. Darby Borough*, 7 F.3d 377, 381 (3d Cir. 1993) (evaluating public interest in terms of what "the prosecutor" knew at the time of the agreement). But given the federal and state statutes addressing labor trafficking, there are still important public interest factors pertinent to determining enforceability in this case as well.

Pennsylvania statute bars releases that force a victim of trafficking to agree that their conduct was voluntary, 18 Pa. C.S. § 3051(g), and both statutes deem abuse of legal process as an element of trafficking behavior. 18 U.S.C. §1589(a)(3); 18 Pa. C.S. § 3012(b)(4). The interests protected by these statutes are similar to the interests protected by 42 U.S.C. § 1983, including interests embodied by the Thirteenth Amendment, and as such are of substantial public importance. I therefore hold that *Livingstone* should govern the issue of procedural unconscionability.

In applying the *Livingstone* factors to the record before me, the majority of which weigh in favor of Plaintiff, I begin with the deposition of Plaintiff, who testified "[t]hey made me sign this document after I was arrested." Pl.'s Dep. 50:24-25. When asked how he was compelled to sign, Plaintiff answered "[a]t that point, I was about to be sentenced by a judge, and they told me if I did not sign the document, they told me, number one, that I wouldn't get paid, and number two, that I could spend time in jail." *Id*. at 51:2-8. Defense counsel did not pursue these answers to any further degree at the deposition, but on its face this testimony provides a factual basis for duress. A finding of duress would be consistent with other evidence in the record, including Plaintiff's status as a non-resident worker, his concern over remaining eligible for an H-2B visa, his need to collect his pay to support himself, and his purported belief that both Carl and Mariana Hemphill had influence with law enforcement, based upon what he had been told and the fact that he had indeed been arrested. Hemphill's lawyer was the drafter of the release agreement, and although the length of time Castillo had for review was not explored at deposition, he averred in his complaint that he only had a chance to review the agreement in the courthouse, shortly before the hearing was set to take place. Compl. ¶ 291. Nothing in the record here suggests that the agreement was reviewed in open court with a judge to address the rights being

waived by either party. The text of the agreement was in English, a language Castillo contends he is not fluent in, and thus Castillo needed to rely on his counsel's oral summary of the agreement in Spanish.[11] The two *Livingstone* factors weighing in favor of Hemphill are that Castillo was not incarcerated at the time of the agreement, and that he consulted with counsel. But the record here is not clear as to when or for how long Castillo conferred with his attorney. In *Rumery*, the Court placed some emphasis on the fact that the defendant was a wealthy businessman able to retain experienced counsel and had three days to decide whether to enter into the agreement. 480 U.S. at 394. Taking the record as a whole, there are facts from which a reasonable fact-finder could make determinations that would support a finding of procedural unconscionability as a matter of law, such that Defendants' motion for summary judgment must be denied.

In *Livingstone II*, the Court also held that the party seeking to enforce such a release-dismissal agreement has the burden of showing voluntariness by clear and convincing evidence and determined that this standard controls under both federal and Pennsylvania law. 91 F.3d at 536. But the release agreement there was not written but oral, albeit memorialized on the record by the judge. The Court of Appeals held open the question of burden where a non-prosecution agreement is written, not oral. *Id*. at 536 n.34. If this case proceeds to trial, the parties will be requested to brief where the burden of persuasion should lie and the controlling evidentiary standard. Additionally, because unconscionability is an issue for the Court, and because the

---

[11] The agreement states that "Counsel for Employee agrees that *he will explain the legal meaning* of this Mutual Release between Parties to Employee fully and completely, and in Spanish, the Employee's primary language." Ex. 8 to Def.'s MSJ ¶ 7 (emphasis added). Read literally, this language seems to suggest that the agreement was not one negotiated at arm's length, but presented to Castillo to sign.

16

release, if enforceable, constitutes a legal defense, the parties will be requested how best to frame the issue for resolution.

        2.    *Public Policy*

Castillo additionally argues that the agreements are contrary to public policy, under both Pennsylvania and federal law.

<u>Pennsylvania Law</u>

Pennsylvania has followed the Restatement (Second) of Contracts with respect to determining whether contracts may be unenforceable due to violating public policy: "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." *Central Dauphin School Dist. v. American Casualty Co.*, 426 A.2d 94, 96 (Pa. 1981); Restatement (Second) of Contracts § 178(1) (1981). Castillo cites the following provision of Act 105 to support his argument that these releases are contrary to public policy:

> No person may avoid liability under [18 Pa. C.S. § 3051, providing a civil cause of action for trafficking] by: (1) a conveyance of any right, title or interest in real property; or (2) an agreement, including an indemnification agreement or hold harmless agreement, that purports to show the consent of the victim of human trafficking.

18 Pa. C.S. § 3051(g).

The release would certainly appear to qualify as a "hold harmless" agreement, in that the first paragraph requires Castillo to aver that he has "voluntarily withdrawn from the employment of Employer without compelling and necessitous reasons," language that appears to require him to affirmatively consent to the conduct that is the subject of this action. Moreover, if his passport and Social Security card were confiscated by Defendants, that would constitute *per se* evidence

17

that he was a victim of trafficking under federal law, if not under state law as well. *See* 18 U.S.C. § 1592.

At a minimum, there are material issues of fact as to whether the release must be deemed unenforceable as a matter of public policy, rendering summary judgment improper. As with unconscionability, if this case proceeds to trial, the parties will be directed to brief alternative approaches to resolving this issue, to include whether special interrogatories need to be submitted, and whether the issue of enforceability should be bifurcated.

## Federal Law

Among Plaintiff's claims is one brought under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219. Although the Third Circuit has not yet definitively addressed this issue, numerous courts have held that approval from the Department of Labor or a federal court is required for the release of FLSA claims. *Adams v. Bayview Asset Mgmt., LLC*, 11 F. Supp. 3d 474, 476 (E.D. Pa. 2014) (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982)); *see also In re Chickie's & Pete's Wage & Hour Litig.*, 2014 WL 911718 (E.D. Pa. Mar. 7, 2014) (collecting district court cases that apply the standard set forth in *Lynn's Food Stores*). I agree with the reasoning of those cases and hold that the release cannot operate to extinguish Castillo's FSLA claim.

More broadly, Plaintiff argues that the release is also void as against public policy under federal law. In *Rumery*, the Supreme Court assessed the question of whether plaintiffs' waiver of pursuing § 1983 actions against state officials in exchange for release of criminal liability was contrary to public policy. As explained by Justice Powell:

> The question whether the policies underlying that statute may in some circumstances render that waiver unenforceable is a question of federal law. We resolve this question by reference to traditional common-law principles, as we have resolved other questions about

18

> the principles governing § 1983 actions. *E.g.*, *Pulliam v. Allen*, 466 U.S. 522, 539-540 (1984). **The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement.**

480 U.S. at 392 (emphasis added).

In *Rumery*, Justice O'Connor advocated that this standard be applied using a factually sensitive "case-by-case" approach in analyzing § 1983 waivers, and for the reasons set forth above in my analysis of *Livingstone*, I am persuaded that a similar standard should apply in analyzing Castillo's purported TVPA waiver. Once again, if this case proceeds to trial, the parties will be directed to brief alternative approaches to resolving Plaintiff's contention that the release is against public policy under federal law.

### B. Liability of Defendants Other Than Carl Hemphill and KAH Transportes

Looking at the record in the light most favorable to Castillo, there are genuine disputes of material fact as to the liability of the other Defendants listed in the complaint. Castillo has alleged, for instance, that Mariana Hemphill engaged in threatening and coercive behavior toward him. Furthermore, Castillo points to evidence that all the companies listed, including KAH Transportes, have effectively operated in concert to further the Hemphills' businesses, are deeply interrelated, and have benefited from the trafficking conduct alleged. These questions must be resolved by a jury.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment will be denied. An appropriate order follows.

      /s/ Gerald Austin McHugh
      United States District Judge