UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSE ENRIQUE CASTILLO CHAIDEZ,<br>            Plaintiff<br>       v.<br><br>CARL HEMPHILL, KAH TRANSPORTES,<br>LLC, MARIANA HEMPHILL, THREE<br>SEASONS LANDSCAPE CONTRACTING<br>SERVICES, INC., MJC LABOR<br>SOLUTIONS, LLC, MJC, LP., DELCO<br>MULCH AND SUPPLY, LLC, and<br>OVERBROOK PARK HOLDING CO.,<br>LTD.,<br>            Defendants | :<br>:<br>:<br>:  Civil Action No. 18-1837<br>:<br>:<br>: |

**FIRST AMENDED COMPLAINT**

**NATURE OF ACTION**

1.  Plaintiff Jose Enrique Castillo Chaidez, a Mexican national formerly employed by
    Defendants pursuant to the federal H-2B temporary worker visa program, brings this action
    against Defendants for human trafficking and wage violations. Specifically, Defendants
    violated Mr. Castillo's rights under the federal Trafficking Victims Protection Act
    ("TVPA"), as amended, 18 U.S.C. §§ 1581–97; the Fair Labor Standards Act ("FLSA"), 29
    U.S.C. §§ 201–219; Pennsylvania Act 105 ("Act 105"), 18 Pa. C. S. §§ 3001-3072; the
    Pennsylvania Minimum Wage Act of 1968 ("MWA"), 43 P.S. §§ 333.101–115; the
    Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1–260.12; the
    Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S.
    §§ 201-1–201-9.2; and Pennsylvania common law causes of action for Breach of Contract
    and Unjust Enrichment.

2.  Mr. Castillo was recruited while he was in Mexico to work as a truck driver for Defendant
    KAH Transportes in Pennsylvania pursuant to the H-2B temporary worker visa program. Mr.
    Castillo contracted with Defendants to begin work in March 2015. In reliance of that
    contract, he incurred debts to finance his visa processing and other anticipated expenses upon

1

his arrival in the United States. Defendants then delayed Mr. Castillo's start date by over one month and prohibited him from accepting employment in Mexico during that time.

3. When Mr. Castillo did arrive in the United States, Defendants confiscated his passport, required him to make monthly payments for filthy, over-crowded and vermin-infested housing, made him perform manual labor outside the scope of his contract, attempted to assign his labor though contract to other companies, and did not pay him for all of the hours he worked.

4. When Mr. Castillo told Defendants he wanted to return to Mexico, Defendants informed him that he was contractually obligated to continue working for them, that he had to do what they wanted, that he could not leave, and that, if he did, they would cancel his visa, "close the door" on the H-2B temporary visa program to him forever, and have him arrested. Mr. Castillo continued to work for Defendants for several months out of fear that, if he stopped he would be arrested, and thus lose his ability to work as a long-haul truck driver and to support his family upon his return to Mexico. Four months later, Mr. Castillo called the National Human Trafficking Hotline for help.

5. When Mr. Castillo then attempted to leave the job and went to pick up his last paycheck, Defendant Carl Hemphill called the local police department and knowingly made a fraudulent report that Mr. Castillo had committed criminal acts. As a result, he was arrested by local police on the basis of that false report, spent three nights in county jail, and had to complete a deferred prosecution program.

6. Mr. Castillo brings this civil action to recover damages due to him as a victim of human trafficking and forced labor, recover unpaid wages due to him, recover additional damages as permitted by claims brought herein, and to ask the Court for injunctive relief including barring Defendants from participating in the H-2B temporary visa program.

## JURISDICTION AND VENUE

7. The federal question jurisdiction of this Court is invoked pursuant to 18 U.S.C. §§ 1595, 28 U.S.C. §§ 1331, 1337, 1343 and 29 U.S.C. § 216(b).

8. This Court has supplemental jurisdiction over Mr. Castillo's state law claims under 28 U.S.C. § 1367 because those claims arise out of the same operative facts as the claims arising under

federal law and are so related to those claims that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

9.  Defendants are actively conducting business in the Commonwealth of Pennsylvania and are therefore subject to this Court's personal jurisdiction.

10. Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as Defendants' actions and/or omissions took place in Delaware County, Pennsylvania within the Eastern District of Pennsylvania.

## PARTIES

### *Plaintiff*

11.  Plaintiff Jose Enrique Castillo Chaidez is a Mexican national who currently resides in Philadelphia, Pennsylvania.

12. Mr. Castillo entered the United States for the first time on April 19, 2015 pursuant to an H-2B temporary work visa authorizing him to work as a truck driver for KAH Transportes.

13. Mr. Castillo consented to be a plaintiff in a FLSA action on April 30, 2018 as reflected in the document attached as Exhibit A.

### *Employer Defendants*

14. Defendant Carl Hemphill ("Defendant Hemphill"), is an individual who, upon information and belief, resides at 27 Pilgrim Road, Drexel Hill, Pennsylvania 19026.

15. Defendant Mariana Hemphill is an individual married to Defendant Hemphill and, upon information and belief, also resides at 27 Pilgrim Road, Drexel Hill, Pennsylvania 19026.

16. Upon information and belief, Defendant KAH Transportes, LLC ("KAH" or "KAH Transportes") is a limited liability company registered in the state of Delaware, with its primary place of business at 1720 S. State Road, Upper Darby, PA 19082. Records of the State of Delaware Secretary of State reflect Defendant KAH was created on December 9, 2013.

17. Upon information and belief, KAH Transportes is wholly owned and operated by Defendant Carl Hemphill.

18. Defendant Three Seasons Landscape Contracting Services, Inc. ("Three Seasons") is a business corporation registered with the Commonwealth of Pennsylvania Department of

State, with its primary place of business at 1720 S. State Road, Upper Darby, PA 19082, and a registered mailing address of 27 Pilgrim Lane, Drexel Hill, PA 19026. Records of the Commonwealth of Pennsylvania Department of State reflect Defendant Three Seasons was created on November 30, 2012.

19. Upon information and belief, Three Seasons is wholly owned by Defendant Hemphill, who as President of the company manages and controls the day-to-day operations of Three Seasons.

20. At times relevant to this action, Three Seasons operated in Philadelphia, Delaware, Chester, Montgomery, and Bucks Counties, Pennsylvania. In addition, Three Seasons also operated in New Castle County, Delaware.

21. Defendant MJC Labor Solutions, LLC ("MJC Labor Solutions"), is a staffing agency registered in the Commonwealth of Pennsylvania as a Limited Liability Company with a registered office address of 1720 S. State Road, Upper Darby, PA 19082. Records of the Commonwealth of Pennsylvania Department of State reflect Defendant MJC Labor Solutions was created on March 4, 2004.

22. Upon information and belief, MJC Labor Solutions is wholly owned and operated by Defendant Hemphill.

23. Defendant Three Seasons is a business successor to Defendant MJC Labor Solutions which in years prior to 2013 had performed the same functions in relationship to the employment of H-2B workers as were previously performed by Defendant MJC Labor Solutions during the period 2008–2012.

24. Defendant Delco Mulch and Supply, LLC ("Delco Mulch") is a limited liability company registered in the Commonwealth of Pennsylvania with a registered office address of 1720 S. State Road, Upper Darby, PA 19082. Records of the Commonwealth of Pennsylvania Department of State reflect Defendant Delco Mulch and Supply was created on February 24, 2010.

25. Upon information and belief, Defendant Delco Mulch is wholly owned and operated by Defendant Hemphill.

26. At all times relevant to this action, Defendants KAH, Three Seasons, MJC Labor Solutions, and Delco Mulch acted individually and/or by and through their actual and apparent agents, including but not limited to Defendants Carl Hemphill and Mariana Hemphill.

27. At all times relevant to this action, Defendant Hemphill acted by and through the corporations that he wholly owns and controls, including but not limited to KAH, Three Seasons, MJC Labor Solutions, and Delco Mulch.

28. Upon information and belief, Defendants KAH, Three Seasons, MJC Labor Solutions, and Delco Mulch provide landscaping services; provide contract laborers to individuals and companies for landscaping and construction jobs; repair landscaping equipment; rent construction equipment to the public; accept yard waste and debris; cut and sell firewood; sell leaf compost; shred wood for mulch, transport shredded wood to a facility to be treated and processed into finished mulch, and provide finished commercial mulch to the public.

29. Upon information and belief, Defendant Hemphill has frequently utilized the H-2B program to bring workers from Mexico, Guatemala, and El Salvador to the U.S. on H-2B visas to do landscaping work for his companies, including but not limited to Defendants KAH, Three Seasons, MJC Labor Solutions, and Delco Mulch.

30. In 2015, Defendant KAH was certified by the Department of Labor to fill three truck driver positions through the H-2B visa program.

31. In 2015, Defendant Three Seasons was certified by the Department of Labor to fill 44 landscaping positions through the H-2B visa program.

32. In 2015, Defendant MJC Labor Solutions was certified by the Department of Labor to fill two small engine mechanic positions through the H-2B visa program.

33. Defendant Three Seasons, in conjunction with Defendant MJC Labor Solutions, is and was utilized by Defendants including Defendant Carl Hemphill to recruit and supply labor—including H-2B temporary workers—to other businesses, including Defendant KAH Transportes.

34. At all times relevant to this action, Defendants Carl Hemphill, Mariana Hemphill, KAH, Three Seasons, MJC Labor Solutions, and Delco Mulch (collectively, "Employer Defendants") were employers of Plaintiff Castillo within the meaning of the FLSA at 29 U.S.C. § 203, the MWA at 43 P.S. § 333.103, and the WPCL at 43 P.S. § 260.2a.

35. At all times relevant to this action, Employer Defendants were joint employers within the meaning of 29 CFR §§ 791.2, 825.106.

### *Property Defendants*

36. Overbrook Park Holding Company, Ltd. ("Overbrook") is a limited liability company registered in the Commonwealth of Pennsylvania with a registered office address of 1720 S. State Road, Upper Darby, Pennsylvania 19082. Records of the Commonwealth of Pennsylvania Department of State reflect Defendant Overbrook Park Holding Company was created on March 4, 2004.

37. Upon information and belief, Overbrook is wholly owned and operated by Defendant Hemphill.

38. Upon information and belief, Employer Defendants and entities in their control charge money to workers employed by Employer Defendants to rent housing at the following locations in Philadelphia:  6533 Haverford Avenue; 6535 Haverford Avenue; 6335 Vine Street, and 848 N. 63rd Street.

39. Upon information and belief, the property at 6335 Vine Street is owned by Overbrook Park Holding Company.

40. MJC, LP is a limited partnership registered in the Commonwealth of Pennsylvania with a registered office address of 1720 S. State Road, Upper Darby, Pennsylvania 19082. Records of the Commonwealth of Pennsylvania Department of State reflect Defendant MJC, LP was created on October 1, 2004.

41. Upon information and belief, Defendant MJC, LP is owned and operated in part by New Millennium Realty Group, LLC.

42. Upon information and belief, New Millennium Realty Group, LLC is owned and operated by Defendant Carl Hemphill.

43. At all times relevant to this action, Defendants Overbrook and MJC, LP (hereinafter "Property Defendants") acted individually and/or by and through their actual and apparent agents, including but not limited to Defendants Carl Hemphill and Mariana Hemphill.

44. At all times relevant to this action, Defendant Hemphill acted by and through Property Defendants.

45. At all times relevant to this action, Property Defendants received money and financially profited from the actions of Employer Defendants occurring on the premises of properties owned by them.

46. At all times relevant to this action, Property Defendants were uniquely positioned to observe the manifestations and indications of trafficking and forced labor occurring on their properties, and, through their agents, were actually aware of these activities on their properties.

### Prior Litigation

47. Defendants Carl Hemphill and MJC Labor Solutions were previously involved in litigation regarding rental housing fees and expenses charged to H-2B workers, which resulted in a Consent Order for Injunctive Relief entered by this Court in *Fuentes, et al. v. MJC Labor Solutions, et al.*, No. 2:07-cv-00980-RBS (E.D. Pa., Docket 51, November 3, 2009).

48. Defendants Carl Hemphill, Mariana Hemphill, Three Seasons, and MJC Labor Solutions were also previously involved in litigation presenting wage claims by a class of H-2B workers. This Court recently ordered its approval of a proposed class settlement agreement in that case. *See Urrutia, et al. v. Three Seasons Landscape Contracting Service, Inc., et al.*, No. 2:15-cv-06416-TR (E.D. Pa., Docket 61, April 27, 2018).

## STATEMENT OF FACTS

### The H-2B Temporary Visa Program

49. The H-2B Temporary Non-Agricultural Worker program ("H-2B Program" or "H-2B Temporary Worker Visa Program") is a visa program available to U.S. employers seeking to fill temporary, unskilled positions in industries other than agriculture when those employers contend that they cannot find qualified U.S. workers for the positions.

50. The Department of Labor sets prevailing wage rates for particular job classifications that may be filled under the program.

51. An employer wishing to hire workers through the H-2B program must submit a temporary labor certification application providing the specific job classification for the position the employer seeks to fill, as well as the duties and hours of labor the foreign worker will be asked to perform.

52. If that labor certification is approved, the employer may petition the United States Citizenship and Immigration Services (USCIS) for H-2B visas to bring in workers from abroad to work in the specific positions outlined by the labor certification.

7

53. Upon approval by USCIS, the employer or its agents recruit prospective H-2B workers who are outside of the United States.

54. The recruited workers then apply for the H-2B visa at a U.S. embassy or consulate abroad.

55. The visa application process requires the payment of a visa fee.

56. The worker attends an interview at the embassy or consulate.

57. If approved, the U.S. Department of State issues the H-2B visa to the worker.

58. During this process, the U.S. Department of State provides the worker with a pamphlet that explains his rights as an H-2B worker and employee in the United States. This pamphlet contains information regarding human trafficking and the phone number for the National Human Trafficking Hotline.

59. After the visa is issued, the worker may then travel to the United States and seek admission into the country pursuant to the H-2B visa at a designated port of entry.

60. The sponsoring employer must cover the cost of the visa fee and the worker's travel to the employer's worksite in the United States to the extent that passing those costs on to the worker would bring the worker's wages during the first week of employment below the minimum wage for the hours worked.

61. The H-2B visa issued to the worker lists the duration for which the visa is valid and lists the name of the sponsoring employer.

62. Pursuant to the H-2B rules, the exclusive purpose of the worker's stay in the United States is to work for the sponsoring employer in the position certified by the Department of Labor for the time period authorized by the visa.

63. The worker is not authorized to perform work outside the scope of the job certification.

64. The worker is not authorized to perform work for any other employer.

65. Upon completion of the specified period of employment, the worker must leave the United States or apply to extend or change his lawful immigration status.

### *Employer Defendants Recruit Mr. Castillo*

66. Mr. Castillo is a citizen of Mexico who currently resides in Philadelphia, Pennsylvania.

67. Mr. Castillo's native language is Spanish. During the time period at issue, Mr. Castillo was not proficient in English.

8

68. Prior to his arrival in the United States, Mr. Castillo resided with his wife and children in Ciuliacan, Sinoloa, Mexico

69. Mr. Castillo earned the majority of his living in Mexico as a long-haul truck driver.

70. He worked for a company called Transportes Perez Carillo, which contracted with farmers to transport produce on a seasonal basis, from around July to December each year.

71. Mr. Castillo often transported fruits and vegetables to the U.S.-Mexico border between Nogales, Mexico and Sonora, Arizona. He entered the border area where cargo was loaded and unloaded.

72. To operate the tractor-trailer in Mexico, Mr. Castillo was required to maintain a Class B Commercial Driver's License. The license authorizes the driver to drive in the United States and Canada.

73. In 2014 or early 2015, Mr. Castillo attended a job fair sponsored by the *Servicio Nacional de Empleo Sinaloa* (National Employment Service Sinaloa) (herein after referred to as "*Servicio Nacional*"), a government agency.

74. Plaintiff Castillo hoped to find year-round work as a truck driver for a large corporation in Mexico.

75. After attending the job fair, a representative from the *Servicio Nacional* asked Mr. Castillo if he would like to interview for temporary positions in the United States.

76. In or around early February 2015, Mr. Castillo attended a job interview at the offices of *Servicio Nacional* with a representative from a company based in the United States. The company sought to hire a truck driver through the H-2B program to work for several months in the United States.

77. In or around early February 2015, Mr. Castillo also attended a separate job interview at *Servicio Nacional* with Defendant Hemphill.

78. Defendant Hemphill informed Mr. Castillo that he owned a trucking company called KAH Transportes.

79. Defendant Hemphill informed Mr. Castillo that he needed drivers to transport mulch and other landscaping materials.

80. Defendant Hemphill informed Mr. Castillo that he needed drivers with experience.

81. Defendant Hemphill informed Mr. Castillo that he needed drivers with clear driving records.

82. Defendant Hemphill informed Mr. Castillo that he required prospective employees to take a drug test and to undergo a criminal background check.

83. Defendant Hemphill informed Mr. Castillo of his hourly wage rate and stated that he would earn one and a half times that rate for hours worked over forty hours per week.

84. Defendant Hemphill informed Mr. Castillo, in words or substance, that he would be given the opportunity to work a lot of hours as a truck driver and thereby earn a sizeable income.

85. Defendant Hemphill offered the position to Mr. Castillo and Mr. Castillo accepted.

86. Upon information and belief, and pursuant to the approved Application for Temporary Employment Certification, form ETA 9142B, for KAH Transportes in 2015, Mr. Castillo was hired for the position of Tractor-Trailer Truck Driver. The SOC (ONET/OES) code identified on the ETA 9142B was 53-3032 and the occupation title was Heavy and Tractor-Trailer Truck Drivers.

87. In around the first week of February 2015, at the offices of *Servicio Nacional*, Mr. Castillo signed a contract to work for KAH Transportes until December 2015.

88. He also signed a contract to rent housing from Defendants for $250 per month.

89. A man named Jaime was also present and signed a contract to work as a driver for KAH Transportes.

90. Defendant Carl Hemphill was also present.

91. Defendant Hemphill did not provide Mr. Castillo with a copy of the contract.

92. Defendant Hemphill informed Mr. Castillo that he was now a contracted worker and could not accept other employment.

93. At the time Mr. Castillo signed the work contract, Defendant Hemphill informed Mr. Castillo that Defendants would arrange his flight to the United States as soon as Mr. Castillo obtained the H-2B visa. As a result, Mr. Castillo began to make preparation to leave Mexico.

94. Mr. Castillo and his wife borrowed 25,000 Mexican pesos from a co-worker of Mr. Castillo's wife in order to pay for expenses related to the H-2B visa application process, including Mr. Castillo's travel to and from the U.S. consulate in Hermosillo, his lodging in Hermosillo, and the visa fee. In February 2015, 25,000 pesos was worth the equivalent of approximately $1,519 U.S. dollars.

95. Mr. Castillo also intended to use the money they borrowed for any expenses upon his arrival in the United States.

96. Mr. Castillo also signed a contract with his mortgage lender to make his mortgage payments directly to them while he was in the United States. As was typical with the lender, Mr. Castillo's mortgage payments had been deducted directly from his paychecks in Mexico up until that time.

97. On or before February 18, 2015, *Servicio Nacional* provided Mr. Castillo with a letter that contained information and instructions about the H-2B visa application process. The letter was from Gabriela Orozco, Secretary for MJC Labor Solutions.

98. On February 19, 2015, Mr. Castillo paid the visa fee of 2,850 Mexican Pesos. In February 2015, 2,850 Mexican Pesos was the equivalent of approximately $173.25 U.S. Dollars.

99. On March 8, 2015, Mr. Castillo said goodbye to his family to begin his trip to obtain the visa and travel to the United States. Mr. Castillo believed that he would fly to the United States directly after he obtained the visa in order to begin work for Defendants.

100. He paid to travel more than 10 hours by bus from his home in Culiacan, Sinaloa to the U.S. consulate in Hermosillo.

101. He paid to stay in a hotel in Hermosillo for two nights.

102. On March 9, 2015, Mr. Castillo attended an interview at the U.S. consulate in Hermosillo.

103. On March 10, 2015, Mr. Castillo was issued an H-2B visa to work as a truck driver for Defendant KAH Transportes. The visa was valid from March 10, 2015 until December 23, 2015.

104. Jaime, who had been interviewed by Defendant Hemphill at the same time as Mr. Castillo, was also issued an H-2B visa to work as a driver for Defendant KAH Transportes.

105. Both Jaime and Mr. Castillo expected to leave for the United States the next day.

106. Mr. Castillo contacted Employer Defendants. Employer Defendants told him, in words and substance, that they were not going to send the men their airline tickets immediately and would let them know when they were going to travel.

107. Mr. Castillo could not afford to pay to stay additional nights in a hotel in Hermosillo.

108. Mr. Castillo and Jaime decided to return by bus to Culiacan to wait for Employer Defendants' call at home.

109. On March 10, 2015, Mr. Castillo paid to return home by bus.

110.    Between March 10, 2015 and April 19, 2015, Mr. Castillo contacted Employer
        Defendants approximately five times by telephone to inquire as to the start date of his
        employment.

111.    On those occasions, Employer Defendants told Mr. Castillo, in words or substance, that
        his start date was delayed due to weather conditions, including snow, in the Philadelphia
        area.

112.    Between March 10, 2015 and April 19, 2015, less than 1 inch of snow accumulated in the
        Greater Philadelphia area. This is an average snow accumulation for the time of year in the
        region.

113.    On at least one occasion between March 10, 2015 and April 19, 2015, Mr. Castillo also
        contacted *Servicio Nacional* to inquire as to the start date of his employment with Employer
        Defendants.

114.    Between March 10, 2015 and April 19, 2015, Mr. Castillo did not work in Mexico.

115.    Between March 10, 2015 and April 19, 2015, a representative from the other U.S.-based
        company that had interviewed Mr. Castillo for an H-2B truck driving position contacted Mr.
        Castillo to offer him the position.

116.    Mr. Castillo informed the representative that he had signed a contract with another
        company and therefore had to decline the company's offer.

117.    Between March 10, 2015 and April 19, 2015, Mr. Castillo continued to wait in Mexico
        and he and his wife used the money they had borrowed for his trip to the United States to pay
        their living expenses.

118.    Defendants did not bring Mr. Castillo to the United States until April 19, 2015.

119.    Beginning on Saturday April 18, 2015, Mr. Castillo flew from Culiacan to Mexico City,
        from Mexico City to New York City, and from New York City to Philadelphia with Jaime.

120.    On April 19, 2015, both men were admitted to the United States pursuant to an H-2B
        temporary visa to work for KAH Transportes.

121.    Mr. Castillo had approximately $100 on his person when he arrived in Philadelphia.

122.    On April 19, 2015, Defendant Hemphill picked Mr. Castillo and Jaime up at Philadelphia
        International Airport and drove them to 1720 S. State Road, Upper Darby, Pennsylvania.

123.    When Mr. Castillo arrived at 1720 S. State Road, he became concerned when he did not
        see tractor-trailers at the property.

124.  Plaintiff Hemphill met with Mr. Castillo and Jaime in Employer Defendants' office.

125.  Mr. Castillo and Jaime signed paperwork.

126.  Mr. Castillo does not know what the paperwork said.

127.  Employer Defendants did not give Mr. Castillo a copy of the paperwork.

128.  Defendant Mariana Hemphill was present.

129.  Defendant Mariana Hemphill confiscated Mr. Castillo's and Jaime's passports. She retained possession of the passports and only provided them with a copy to carry.

### *Defendants House Mr. Castillo in Unlawful Conditions*

130.  Defendant Hemphill drove Mr. Castillo and Jaime to the housing they would be renting from Defendants for $250 each per month.

131.  The housing was located at 6335 Vine Street, Philadelphia, Pennsylvania.

132.  Upon information and belief, 6335 Vine Street is a two-story building owned by Defendant Overbrook Park Holding Company, Ltd.

133.  Defendant Hemphill showed Mr. Castillo and Jaime to the apartment on the first floor. The apartment consisted of a hallway, a small living room, a kitchen, a bathroom and one bedroom.

134.  Upon entering the apartment, Mr. Castillo saw mattresses on the floor throughout the apartment and no other furniture.

135.  The apartment was filthy and had a bad odor.

136.  Mr. Castillo learned that a total of six men, including himself and Jaime, would be paying Defendants to share the apartment.

137.  Each of the other six men was a foreign national who performed landscaping and gardening work for Employer Defendants.

138.  On the night of April 19, 2015, Mr. Castillo and two other men each slept on a mattress on the living room floor. Two other men slept on mattresses on the floor in the bedroom, and the final man slept on a mattress on the floor in the hallway.

139.  On the morning of Monday, April 20, 2015, Mr. Castillo woke up with bed bug bites. When he went to the kitchen to make coffee, rats ran off of the counters.

***Employer Defendants Change the Promised Terms and Conditions of Employment***

140.   Mr. Castillo and Jaime walked approximately thirty minutes from the housing to Employer Defendants' office at 1720 S. State Road and arrived at or around 7:00 a.m., as instructed.

141.   That morning, Defendant Mariana Hemphill drove Mr. Castillo and Jaime to a local Social Security Administration office to apply for a Social Security Number.

142.   Defendant Mariana Hemphill had their passports with her at that time and kept them when they returned to the office.

143.   When they returned to Employer Defendants' offices, Defendant Hemphill told the men that they could not work for Defendants until the Social Security numbers arrived at the office, which would be a delay of several days.

144.   However, Employer Defendants and their agents directed Mr. Castillo and Jaime to remain at Employer Defendants' offices until at or around 7:00 p.m. During that time, Employer Defendants and their agents showed Mr. Castillo and Jaime around the offices, shop, and yards. Specifically, a man named Arnoldo picked Mr. Castillo up in a tractor-trailer and drove him around the area to orient him to his new routes and duties. When Mr. Castillo was not in the truck with Arnoldo, he was working in Employer Defendants' yard and offices. This work included picking trash out of yard debris that Employer Defendants' employees would later grind into wood chips.

145.   On Tuesday, April 21, 2015 and Wednesday, April 22, 2015, Mr. Castillo and Jaime reported to work at Employer Defendants' office at or around 7 a.m. and did not leave until at or around 7:00 p.m. Each day, Mr. Castillo worked for Employer Defendants during those twelve hours as he had the previous day.

146.   On Thursday, April 23, 2017, Employer Defendants informed Mr. Castillo that he could begin work because his Social Security Card had arrived at the office.

147.   Employer Defendants showed Mr. Castillo his Social Security Card and had him sign it.

148.   Employer Defendants kept Mr. Castillo's Social Security Card.

149.   From around Thursday, April 23, 2015 to around Wednesday May 6, 2015, Mr. Castillo worked thirteen to fourteen hours per day, seven days per week.

150.   Mr. Castillo arrived at Employer Defendants' office each morning at approximately 6:00 a.m. to pick up the keys to the truck and a travel logbook.

14

151.   Defendant Hemphill was typically at the office at this time.

152.   Mr. Castillo then traveled to the truck's location.

153.   Upon information and belief, Employer Defendants owned two tractor-trailer trucks at the time.

154.   The trucks were located at a parking lot at or near the former Franklin Mint Museum located at 1398 W. Baltimore Pike, Media, Pennsylvania.

155.   The parking lot is approximately thirteen miles from Employer Defendants' office at 1720 S. State Road.

156.   Upon information and belief, the parking lot was rented by Asplundh Tree Company.

157.   Upon information and belief, Asplundh Tree Company contracted with Employer Defendants to transport wood chips to a mulch processing facility in Oxford, Pennsylvania.

158.   To travel to the parking lot, Mr. Castillo took a forty-minute bus ride from Employer Defendants' office to Baltimore Pike and Valley Road in Media, Pennsylvania where he then walked to the location.

159.   Mr. Castillo purchased a weekly transit pass to make this trip.

160.   On or about May 6, 2015, Defendant Hemphill provided Mr. Castillo and Jaime a van to drive from Defendants' offices to the parking lot where the trucks were located.

161.   Defendant Hemphill informed Mr. Castillo and Jaime that he would charge them approximately $20 each per week for use of the van and that they would need to purchase their own gas.

162.   Mr. Castillo used the van for approximately one week.

163.   Mr. Castillo then informed Defendant Hemphill that he could not afford to pay for the van. He resumed taking public transportation from Employer Defendants' offices to the truck's location.

164.   Between the hours of approximately 7 a.m. and 6 p.m., Mr. Castillo drove the truck to several locations in Southeast Pennsylvania to unload and load materials.

165.   From approximately April 23, 2015 to May 6, 2015, Mr. Castillo's truck driving duties for Employer Defendants consisted of the following:

a.   Mr. Castillo transported wood shredded by Employer Defendants' employees at 1720 S. State Road to Hyponex Corporation in Oxford, Pennsylvania to be processed into finished mulch.

    b.   Mr. Castillo picked up shredded wood from Asplundh Tree Company and transported it to Hyponex Corporation in Oxford, Pennsylvania.

    c.   Mr. Castillo picked up finished mulch from a facility in Norristown and transported it to 1720 S. State Road where Employer Defendants later sold it to the public.

166.    Mr. Castillo then returned the truck to the parking lot location in Media, Pennsylvania and traveled back to Employer Defendants' offices.

167.    At Employer Defendants' offices he turned in the keys and completed and turned in his travel log for the day. He left around 7p.m or 8 p.m.

168.    Whenever Mr. Castillo transported shredded wood to Hyponex Corporation, Defendant Hemphill called Mr. Castillo repeatedly to find how many trucks were ahead of him waiting to unload cargo. Defendant Hemphill frequently instructed Mr. Castillo to take his lunch break during that wait time, regardless of how long the wait was or what time of day it occurred.

169.    Upon information and belief, Employer Defendants instructed Mr. Castillo to take his break at these times in order to justify not paying him for the time he spent waiting at Hyponex Corporation to unload the cargo from his truck.

### *Mr. Castillo's Attempts to Leave Employer Defendants' Employ*

170.    After beginning employment with Employer Defendants, Mr. Castillo was told that Employer Defendants would not pay him for three weeks. At no time prior to Mr. Castillo's arrival in the United States did Employer Defendants inform him that they did not intend to pay him until three weeks after he arrived in the country.

171.    He was also informed that it was Employer Defendants' business practice to hold a worker's first week of pay until the end of the season as a type of security deposit.

172.    Because he had no money for food, between April 19, 2015 and April 26, 2015, one of his roommates took Mr. Castillo and Jaime to a local grocery store and bought groceries for the three men to share. The roommate told the men that they could pay him back when Employer Defendants paid them.

173.    Mr. Castillo's roommates also lent him money for transportation and to call his family.

174.    During that period, Mr. Castillo's roommates also informed him that Employer Defendants brought workers from Mexico, Guatemala and El Salvador to the U.S. on H-2B

visas to do landscaping work for Defendants and that Defendants made money by "renting" the workers to other companies to perform landscaping work and other labor. They informed Mr. Castillo that Defendants charged rent to these workers to house them in conditions similar to his own housing.

175.    On or around May 7, 2015, Mr. Castillo informed Defendant Hemphill that he did not want to continue working for Employer Defendants.

176.    Mr. Castillo told Defendant Hemphill that he wanted to return to Mexico.

177.    Defendant Hemphill told Mr. Castillo, in words and substance that Mr. Castillo could not return to Mexico because he had signed a contract with Employer Defendants to work until December and had to continue to work until that time.

178.    At that time, Employer Defendants had not yet paid Mr. Castillo. At Mr. Castillo's request, Defendant Hemphill had provided him a $100 advance on or around May 2, 2015.

179.    Mr. Castillo continued to work for Employer Defendants.

180.    Employer Defendants paid Mr. Castillo for the first time on Friday, May 15, 2015.

181.    Employer Defendants issued Mr. Castillo paychecks for the pay period between April 23, 2015 and May 6, 2015, covering the second and third weeks of work.

182.    Employer Defendants did not pay Mr. Castillo for any of the work performed on April 20, April 21, or April 22 2015.

183.    Employer Defendants did not pay Mr. Castillo for all of the hours worked between April 23 and May 6, 2015.

184.    Employer Defendants deducted rent for April and May 2015.

185.    On or around May 15, 2015, Mr. Castillo asked Defendant Hemphill why his paychecks were missing more than half of the pay he was owed.

186.    Defendant Hemphill told Mr. Castillo that Employer Defendants would pay him the rest in cash at a later date.

187.    Beginning on or around May 7, 2015, Employer Defendants began to reduce Mr. Castillo's driving assignments and instead began to assign Mr. Castillo work in the office and the yard at 1720 S. State Road. This work included sorting yard debris that clients dumped at Employer Defendants' location, cleaning Employer Defendants' offices, and sweeping the yard.

188.    Beginning around May 7, 2015, Defendant Hemphill attempted to send Mr. Castillo to do work for construction companies on five or six separate occasions.

189.    Each time, Mr. Castillo refused and reminded Defendant Hemphill that Employer Defendants had hired him to drive trucks, not to do construction.

190.    On or around Friday May 15, 2015, Defendant Hemphill told Mr. Castillo he didn't have any truck driving work for him that weekend.  Instead, he told Mr. Castillo to be at the office the next morning for a landscaping job.

191.    Mr. Castillo told Defendant Hemphill that he was hired to be a truck driver and would not do landscaping work.

192.    In fact, per the terms of his H-2B visa, Mr. Castillo was only authorized to work as a truck driver for Defendants KAH Transportes while in the United States. He was not authorized to perform work outside the scope of his job duties as a truck driver or to perform work for any other entity except KAH Transportes.

193.    Defendant Hemphill told him to report to work the next morning anyway.

194.    On Saturday, May 16, 2015, Mr. Castillo did not report to work.

195.    Defendant Hemphill called Mr. Castillo and screamed at him, saying, in words and substance, "after I bring you here to work this is how you repay me?!"

196.    On or around May 17, 2015, Mr. Castillo informed Employer Defendants' secretary, Gabriela Orozco, that he wished to return to Mexico. He asked Orozco to arrange a flight for him.

197.    Orozco replied, in words or substance, that Mr. Castillo would change his mind because workers always did.

198.    Defendant Mariana Hemphill overheard the conversation between Mr. Castillo and Orozco.

199.    Defendant Mariana Hemphill threatened Mr. Castillo. In words or substance, she told Mr. Castillo that he had a contract with Employer Defendants and could not return to Mexico. She reminded Mr. Castillo that Employer Defendants sponsored his visa and told him they could cancel it at any time. She stated that Employer Defendants would "close the doors" on the H-2B visa program to Mr. Castillo "forever."

200.    Defendant Mariana Hemphill also told Mr. Castillo that she would call the police on him if he left Employer Defendants' employ.

18

201.    Mr. Castillo was alarmed by Defendant Mariana Hemphill's threats.

202.    Mr. Castillo became afraid that Employer Defendants could prevent him from using the
H-2B visa program to work in the United States in the future.

203.    Mr. Castillo also became afraid that Employer Defendants could jeopardize his ability to
work as a truck driver when he returned to Mexico.  He believed that if Employer Defendants
called the police on him he would have a criminal record in the United States.

204.    Mr. Castillo believed that a criminal record in the United States would negatively affect
his Commercial Driver's License in Mexico. Specifically, he believed that it would prevent
him from driving a truck into the U.S.-Mexico border zones to load and unload cargo.

205.    Mr. Castillo also believed that Employer Defendants actually had the ability to bar him
from the visa program.

206.    Mr. Castillo also believed that Employer Defendants would actually call the police on
him.

207.    Other men who worked for Employer Defendants, both Mr. Castillo's roommates and
men he spoke to while working in Employer Defendants' yard, warned him that Employer
Defendants were powerful people.

208.    Workers told Mr. Castillo that Defendant Mariana Hemphill had personal connections at
the Consulate of Mexico in Philadelphia.

209.    Workers told Mr. Castillo that Defendant Hemphill had personal connections to local
police.

210.    At the time that Defendant Mariana Hemphill threatened Mr. Castillo, Employer
Defendants had Mr. Castillo's passport and Social Security card in their possession.

211.    At that time, Mr. Castillo could not afford to purchase his own plane ticket because he
had transferred the majority of his first paycheck to his wife in Mexico to repay the debt they
had incurred prior to his trip and to pay his family's living expenses.

212.    As a result, Mr. Castillo continued to work for Employer Defendants.

### *Employer Defendants Continue to Fail to Pay Mr. Castillo for All Hours Worked*

213.    In each subsequent paycheck, Employer Defendants failed to pay Mr. Castillo for all of
the hours he worked.

214. In each subsequent paycheck, Employer Defendants paid Mr. Castillo less money than the paycheck before.

215. Employer Defendants also deducted money for Mr. Castillo's airfare to the United States without Mr. Castillo's knowledge or consent.

216. At no time prior to his arrive to the United States did Employer Defendants inform Mr. Castillo that they intended to recover the cost of his flight to the United States.

### *Mr. Castillo Attempts to Leave Employer Defendants' Employ Again and Employer Defendants Have Him Arrested*

217. Between May 15, 2015 and July 8, 2015, Mr. Castillo told Defendant Hemphill multiple times that he wanted to return to Mexico.

218. By June 2015, he informed Defendant Hemphill of this on a near-daily basis. In words and substance, Mr. Castillo told Hemphill that it was clear that Employer Defendants did not have much driving work for him, that he was not contracted to do manual labor, and that he was not happy that Employer Defendants kept trying to contract him out to work for other entities.

219. In fact, per the terms of his H-2B visa, Mr. Castillo was not authorized to perform work outside the scope of his designated job duties and was not authorized to perform work for other entities.

220. Each time Mr. Castillo told Defendant Hemphill he wanted to leave Employer Defendants' employ, Defendant Hemphill told Mr. Castillo that they had a contract and that he could not leave.

221. During this period, Employer Defendants maintained control of Mr. Castillo's Mexican passport, H-2B visa, and U.S. Social Security card.

222. Between May 15, 2015 and July 8, 2015, Employer Defendants continued to attempt to send Mr. Castillo to do landscaping work and construction or demolition work in violation of the terms of his visa for individuals and entities that were, upon information and belief, clients and associates of Employer Defendants..

223. Defendant Hemphill also continued to make Mr. Castillo sort materials and clean at Employer Defendants' yard and office in violation of the terms of his visa.

224.   On a Saturday at the end of June, 2015, Defendant Hemphill brought Mr. Castillo to his home to put together a patio table. Mr. Castillo performed work at Hemphill's home for 4-5 hours in violation of the terms of his visa.

225.   On one occasion, after Employer Defendants informed Mr. Castillo that he would not be driving the following day, Mr. Castillo did not report to work in the morning. Defendant Hemphill went to Mr. Castillo's housing to tell him to report to work.

226.   Defendant Hemphill entered the apartment with a key, without knocking.

227.   He went to Mr. Castillo's sleeping area and woke him up.

228.   Hemphill told Mr. Castillo that he had brought him to the United States and he had to do what Hemphill wanted.

229.   On July 9, 2015, Mr. Castillo again did not report for work with Employer Defendants.

230.   Defendant Hemphill sent Mr. Castillo the following text messages between 1:21 p.m. and 1:28 p.m. on July 9, 2015. The messages were sent in Spanish and are presented here with accompanying English translations (as certified in the document attached as Exhibit B):

   a.   "Al final te quitaste la careta y solito demostraste quien eres en realidad." (You finally took your mask off and you alone revealed who you really are).

   b.   "Es por eso no vas a tener exito en la vuda [sic]." (That's the reason you won't be successful in life).

   c.   "Solo usaste la compania para Cruzar la frontera para estar aqui ilegal." (You used the company to cross the border and live here illegally).

   d.   "Tu no crees que yo se cual es tu plan" (You don't think that I know your plan).

   e.   "Tu nunca tuviste la intencion de no Cumplir el contrato" (You never had the intention of abiding by the contract).

   f.   "Lo peor del caso Robaste la visa a otra persona que queria venir a trabajar verdaderamente" (Worst of all, you stole the visa from somebody who truly wanted to come over here to work).

   g.   "Buscaste pretext para hacer Cumplir su plan diabolico que hiciste en mexico" (You sought a pretext in order to accomplish your diabolical plan that you conceived in Mexico).

   h.   "Que verguenza" (How shameful).

   i.   "Todo mal regresa" (All wrongdoings return to you).

> j.   "Oyelo bien" (Listen well).
>
> k.   "Cobarde" (Coward).

231.   On July 9, 2015, Mr. Castillo called the National Human Trafficking Hotline phone number, which was listed on a pamphlet provided to him by the U.S. consulate in Hermosillo when he obtained his visa.   He informed the person who answered the phone that his employer had threatened to call the police on him if he left his job.

232.   The hotline referred Mr. Castillo to Friends of Farmworkers, Inc., Mr. Castillo's current counsel.


### *Employer Defendants Abuse the Legal Process*

233.   On Friday July 10, 2015, Mr. Castillo went to Employer Defendants' office to pick up his paycheck for work he had performed between June 18, 2015 and July 1, 2015.

234.   Defendant Hemphill was not at the office.

235.   Employer Defendants' secretary Gabriela Orozco told Mr. Castillo that he had to wait until Defendant Hemphill arrived to get his paycheck.

236.   When Defendant Hemphill arrived, he informed Mr. Castillo that he could not have his check until Hemphill inspected the truck that Mr. Castillo drove.

237.   Defendant Hemphill told Mr. Castillo to bring the truck back to the office.

238.   To get to the truck, Mr. Castillo would have to travel by bus.

239.   Mr. Castillo did not have his transit pass on his person and did not have money for bus fare.

240.   Defendant Hemphill began yelling obscenities and, in words or substance, yelled, "This is how you repay me!"

241.   Defendant Hemphill stated that Mr. Castillo was jealous of Hemphill.

242.   In words or substance, Mr. Castillo told Defendant Hemphill that Hemphill was angry because Mr. Castillo was no longer allowing Hemphill to abuse him.

243.   Plaintiff Castillo began to walk to Employer Defendants' yard to borrow money from his co-worker for transportation.

244.   Defendant Hemphill came close to Defendant again and began to yell in his face.

245.   Defendant Hemphill yelled that he didn't want Mr. Castillo talking to other workers.

246.   Plaintiff Castillo informed Defendant Hemphill that he wanted his paycheck.

247.   Defendant Hemphill called the police.

248.   Officers from the Upper Darby Police Department arrived at Employer Defendants' office within several minutes.

249.   An officer spoke to Defendant Hemphill and then walked towards Mr. Castillo with his hands on his handcuffs.

250.   The officer spoke to Mr. Castillo in English and Mr. Castillo did not understand him.

251.   The officer put Mr. Castillo's hands behind his back and handcuffed him.

252.   The officer put Mr. Castillo in a police vehicle, took him to the Upper Darby police station, and placed him in a holding cell.

253.   At no time during the encounter did police officers speak to Mr. Castillo in Spanish or use interpretation.

254.   At no point during his detention at the station did anyone speak to Mr. Castillo in Spanish or use interpretation.

255.   Mr. Castillo was arraigned that day.

256.   Mr. Castillo was not provided with an interpreter at his arraignment and did not understand the proceedings or the charges against him.

257.   Mr. Castillo received paperwork from the court that stated he had a hearing on July 22, 2015 and that bail had been set at $5,000.

258.   Mr. Castillo was detained at Delaware County Correctional Facility on July 10, 2015.

259.   Mr. Castillo called a co-worker. The co-worker paid a $500 bail bond for Mr. Castillo on Saturday, July 11, 2015.

260.   Mr. Castillo was not released from Delaware County Correctional Facility until approximately 9:00 p.m. on the night of Monday, July 13, 2015.

261.   Mr. Castillo took a bus back to the housing he rented from Defendants.

262.   Before he entered the housing, he called one of his roommates.

263.   The roommate informed him that Defendant Hemphill had ordered the men not to allow Mr. Castillo back into the housing.

264.   The roommate  said he would not leave Mr. Castillo out on the street and told him that he would leave the back door open so Mr. Castillo could enter from the back door and not be seen by Employer Defendants' other employees  who slept in the apartment upstairs.

265.   Mr. Castillo slept at the housing that night.

266.   Mr. Castillo was afraid to remain in the housing.

267.   Mr. Castillo believed that Defendant Hemphill would have him arrested again.

268.   He believed that Defendant Hemphill would notify immigration authorities that he had left his job.

269.   Mr. Castillo was afraid that he would be deported before he could resolve the pending criminal charges against him.

270.   It was Mr. Castillo's understanding that an unresolved criminal case in the United States would make him unable to pass the background checks required by prospective employers in his industry in Mexico.  Specifically, he believed that an unresolved criminal case in the United States would prevent him from transporting cargo in and out of the U.S.-Mexico border zone.

271.   Mr. Castillo did not know how to remain in the United States to resolve the criminal charges against him.

272.   Mr. Castillo informed his roommates that he intended to contact the Consulate of Mexico in Philadelphia to seek assistance. His roommates warned him against it. In words or substance, Mr. Castillo's roommates reminded him that Defendant Mariana Hemphill had contacts at the consulate and that Defendant Hemphill had contacts with local police.

273.   Against his roommates' advice, on July 14, 2015, Mr. Castillo contacted the Consulate of Mexico in Philadelphia to seek assistance.

274.   The consulate obtained a criminal defense attorney to represent Mr. Castillo.

275.   On July 14, 2015, Mr. Castillo's wife called the *Servicio Nacional de Empleo Sinaloa* to inform them that Employer Defendants had called the police on Mr. Castillo and had had him arrested.

276.   Upon information and belief, a representative from the *Servicio Nacional* contacted Employer Defendants and Employer Defendants reported that Mr. Castillo was or had been a drug addict.

277.   On July 14, 2015, a representative from *Servicio Nacional* called Mr. Castillo and asked Mr. Castillo if he was a recovering drug addict.

278.   Mr. Castillo reminded the representative that Employer Defendants had required him to take a drug test to obtain the job.

279.   On or around July 15, 2015, Mr. Castillo met with his criminal defense attorney. The attorney informed him that he had been charged with Criminal Trespass/Simple Tresspasser, 18 Pa. C. S. 3503 Sec.B1.1, and Terroristic Threats with Intent to Terrorize Another, 18 Pa. C.S.2706 Sec. A1.

280.   The Affidavit of Probable Cause filed on July 10, 2015 with the police complaint #15-28376 states that Mr. Castillo refused to return company-owned property in order to receive his paycheck, was asked to leave the property, and refused.

281.   The Affidavit of Probable Cause also states the following: "The victim [Defendant Hemphill] returned to police headquarters and provided a signed written statement that Chaidez [Mr. Castillo] threatened his life prior to police arrival. The victim stated that Chaidez [Mr. Castillo] told him he was going to "Pay him in blood" in Spanish. The victim states that he speaks fluent Spanish and took this as a threat to his life."

282.   On or around July 15, 2015, while Mr. Castillo was in the presence of his criminal defense attorney, a representative from *Servicio Nacional* contacted him by phone. The representative told Mr. Castillo, in words or substance, that Defendant Hemphill would drop the charges against him if Mr. Castillo signed documents that Defendant Hemphill had sent to *Servicio Nacional*. The representative encouraged Mr. Castillo to sign the documents.

283.   On or before July 24, 2015, Maria Bernal of *Servicio Nacional* sent an email to Mr. Castillo's criminal defense attorney that stated, in words or substance, that the Director of *Servicio Nacional*, Guadalupe Robles Medina, had spoken with Employer Defendants. Employer Defendants requested that Mr. Castillo sign a statement to the effect that he had left the job voluntarily; sign a document affirming Defendant's version of events leading up to his separation from employment; return the company cell phone, and be available to inspect the truck with a representative from Employer Defendants' company. In exchange, Employer Defendants would withdraw the terroristic threat complaint and give Mr. Castillo the pay Employer Defendants owed him for his last two pay periods.

284.   Mr. Castillo refused to comply with the request and did not sign the documents.

285.   Between approximately July 14, 2015 and July 27, 2014, the representative from *Servicio Nacional* contacted Mr. Castillo approximately three times to encourage him to sign documents prepared by Employer Defendants. On one of those occasions, the representative

asked Mr. Castillo, in words or substance, why he was trying to cause trouble for Employer Defendants.

286. Mr. Castillo's preliminary hearing, which was originally scheduled for July 22, 2015, was continued three separate times until October 14, 2015.

287. During this period, Mr. Castillo attempted to earn a living in the United States. In or around the week of July 22, 2015, Mr. Castillo began collecting metal on the street with a man named Fredy Martinez in order to sell it. Mr. Martinez paid him $50 per day.

288. Mr. Castillo also helped Mr. Martinez's wife sell tamales after church services on the weekends.

289. To help Mr. Castillo move out of the housing he rented from Employer Defendants, Mr. Castillo's roommates pooled $250 to lend him, and he began renting a room from Mr. Martinez.

290. Mr. Castillo began to miss mortgage payments on his home in Mexico.

291. On October 14, 2015, before the hearing in the hallway outside of the courtroom, Mr. Castillo's defense attorney presented him with a document in English that Defendant Hemphill's attorney, John Bradley, had given him.

292. Based on representations made to him in Spanish by his criminal defense attorney about the content of the document, Mr. Castillo understood the document to say that the charges would be withdrawn and Defendant Hemphill would give Mr. Castillo his last paycheck if he signed and agreed not to sue Defendant Hemphill later.

293. By October 14, 2015, when his defense attorney presented him with the document, Mr. Castillo believed he had no choice but to sign the document.

294. On October 14, 2015, the Magisterial District Court dismissed the charge of Terroristic Threat against Mr. Castillo.

295. The other charge, Criminal Trespass, was held for the Court of Common Pleas and modified to Defiant Trespass under 18 Pa. C. S. § 3503(B)(1)(i), which reads: "a person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice of trespass is given by actual communication to the actor."

296. Five months later, on March 16, 2016, at the Court of Common Pleas of Delaware County, Mr. Castillo entered into the Accelerated Rehabilitative Disposition program (ARD)

on the charge of defiant trespass. He was required to undergo a web-based supervision program monitored by the Office of Adult Probation and Parole for one year, to perform thirty-two hours of community service, to complete an anger management course and to pay an ARD program fee of $200.

297.    Mr. Castillo completed the ARD program on March 16, 2017.

298.    To date, Mr. Castillo had paid a total of $1,532 in court costs and administrative fees associated with the adjudication of his criminal case.

299.    Mr. Castillo now works in the restaurant industry.

300.    Mr. Castillo has been unable to work in his chosen profession for three years.

301.    Mr. Castillo has suffered reputational harm as a result of his employment with Employer Defendants.

302.    Mr. Castillo has suffered financial hardship as a result of his employment with Employer Defendants.

303.    Mr. Castillo has suffered emotional and psychological harm as a result of his employment with Employer Defendants.

304.    Mr. Castillo has been separated from his wife and four children for three years.

305.    In October 2017, Defendant Hemphill called Mr. Castillo and asked him how much it would take to get Mr. Castillo to work for him again as a driver.

### FIRST CAUSE OF ACTION

**FORCED LABOR**

**Trafficking Victims Protection Act, 18 U.S.C. § 1589**

(Defendants Carl Hemphill, Mariana Hemphill, KAH, Delco Mulch, Three Seasons, and MJC Labor Solutions)

306.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

307.    This claim is brought under the Trafficking Victims Protection Act, codified at 18 U.S.C. § 1581, *et seq*.

308.    Plaintiff is authorized to bring this civil claim pursuant to the civil remedies provision of 18 U.S.C. § 1595.

309.   Employer Defendants subjected Plaintiff to forced labor in violation of 18 U.S.C. § 1589.

310.   Employer Defendants knowingly threatened Plaintiff with serious harm in order to obtain Plaintiff's labor or services in violation of 18 U.S.C. § 1589(a)(2).

311.   Employer Defendants knowingly abused and/ or threatened to abuse the law or legal process, including the criminal justice system and the H-2B visa program, in order to obtain Plaintiff's labor or services in violation of 18 U.S.C. § 1589(a)(3).

312.   Employer Defendants knowingly, by means of a scheme, plan, or pattern intended to cause the Plaintiff to believe that, if he did not perform labor or services, he would suffer serious harm or physical restraint, in violation of 18 U.S.C. § 1589(a)(4).

313.   Plaintiff is entitled to compensatory damages and punitive damages, restitution, and attorneys' fees in an amount to be determined at trial and any other relief deemed appropriate.

## SECOND CAUSE OF ACTION

### FORCED LABOR

### Trafficking Victims Protection Act, 18 U.S.C. § 1589

(Defendants Overbrook Park Holding Co. and MJC, LP)

314.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

315.   This claim is brought under the Trafficking Victims Protection Act, codified at 18 U.S.C. § 1581, *et seq*.

316.   Plaintiff is authorized to bring this civil claim pursuant to the civil remedies provision of 18 U.S.C. § 1595.

317.   Defendants Overbrook Park Holding Co. and MCJ, LP knowingly benefited from participation in Defendant Employers' venture to subject Plaintiff to forced labor, knowing or in reckless disregard of the fact that Employer Defendants' venture engaged in the providing or obtaining of labor or services through threats of serious harm, coercion, and abuse of the legal process in violation of 18 U.S.C. § 1589(b)

318.   Plaintiff is entitled to compensatory damages and punitive damages, restitution, and attorneys' fees in an amount to be determined at trial and any other relief deemed appropriate.

## THIRD CAUSE OF ACTION

## HUMAN TRAFFICKING

### Trafficking Victims Protection Act, 18 U.S.C. § 1590

(Defendants Carl Hemphill, Mariana Hemphill, KAH, Delco Mulch, Three Seasons, and MJC Labor Solutions)

319.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

320.   This claim is brought under the Trafficking Victims Protection Act, codified at 18 U.S.C. § 1581, *et seq*.

321.   Plaintiff is authorized to bring this civil claim pursuant to the civil remedies provision of 18 U.S.C. § 1595.

322.   In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Employer Defendants knowingly recruited, transported, harbored, provided, and/or obtained Plaintiff for the purpose of subjecting him to forced labor and involuntary servitude.

323.   Employer Defendants recruited Plaintiff in Mexico with the intention of subjecting him to forced labor. Employer Defendants enticed Plaintiff to travel from Mexico by telling him that he would work as a truck driver full time between March 2015 and December 2015 with the legally required overtime pay rate for hours worked in excess of forty per week. Instead, Employer Defendants forced Plaintiff to do manual labor, attempted to force him to work for Employer Defendants' clients, did not pay him for all of the hours he worked, confiscated his Mexican passport, H-2B visa, and U.S. Social Security Card, and repeatedly refused to allow him to end the employment relationship.

324.   Plaintiff is entitled to compensatory damages, punitive damages, and restitution in an amount to be determined at trial and any other relief deemed appropriate.

## FOURTH CAUSE OF ACTION

### Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219

(Defendants Carl Hemphill, Mariana Hemphill, KAH, Delco Mulch, Three Seasons, and MJC Labor Solutions)

325.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

326.    At all times relevant to this case, Employer Defendants were employers within the meaning of 29 U.S.C. § 203(d).

327.    Defendants filed to pay Plaintiff the federal statutory minimum wage for all hours he worked during the time he was employed by Defendants, in violation of 29 U.S.C. § 206(a)(1).

328.    Defendants failed to pay Plaintiff overtime pay for all hours he worked in excess of forty hours per week in violation of 29 U.S.C. § 207(a)(1).

329.    Employer Defendants made unlawful de-facto deductions from Plaintiff's wages for the H-2B visa fee and the transportation and lodging costs related to attending the visa interview, which were expenses incurred primarily for the benefit of Employer Defendants.  These deductions brought Plaintiff's wages in his first week of employment with Employer Defendants below the minimum wage for all hours worked. *See* 29 C.F.R. Sec. 531.35; *Rivera v. Brickman Grp., Ltd.*, No. 05-1518, 2008 WL 81570, at *12 (E.D. Pa. Jan. 7, 2008).

330.    Because of Employer Defendants' deductions, Plaintiff was not paid all wages free and clear during his employment, in violation of 29 U.S.C. § 206(a)(1).

331.    As a result of these violations, Plaintiff suffered damages.

332.    Plaintiff is entitled to an award of damages for unpaid minimum wages and unpaid overtime, plus liquidated damages in an equal amount and interest, as well as attorneys' fees, in an amount to be determined at trial. 29 U.S.C. § 216(b).

## FIFTH CAUSE OF ACTION

### HUMAN TRAFFICKING

### Pennsylvania Act 105, 18 Pa. C. S. § 3051

(Defendants Carl Hemphill, Mariana Hemphill, KAH, Delco Mulch, Three Seasons, and MJC Labor Solutions)

333.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

334.    This claim is brought under Pennsylvania Act 105, codified at 18 Pa. C. S. §§ 3001-3072.

335.    Plaintiff is authorized to bring this civil claim pursuant to the civil remedies provision of 18 Pa. C. S. §3051.

336.    Employer Defendants participated in the human trafficking of Plaintiff.

337.    Employer Defendants recruited and maintained Plaintiff knowing that he would be subjected to involuntary servitude in violation of 18 Pa. C. S. § 3011.

338.    Employer Defendants knowingly subjected Plaintiff to labor servitude in violation of 18 Pa. C. S. § 3012(a) by means of:

    a.   Threatening to cause Plaintiff serious harm;

    b.   Abusing and threatening to abuse the legal process, including the criminal justice system and the H-2B visa program;

    c.   Retaining Plaintiff's real property, specifically his wages, as a means of coercion;

    d.   Engaging in unlawful conduct with respect to Plaintiff's Mexican passport, H-2B visa, and U.S. Social Security Card in violation of 18 Pa. C. S. § 3014; Engaging in fraud, specifically promising Plaintiff particular terms of employment that they did not intent to meet.

    e.   Using a scheme, plan or pattern intended to cause Plaintiff to believe that if he did not perform labor he would suffer serious harm.

339.    Employer Defendants knowingly benefitted financially and received the value of Plaintiff's trafficking—namely, his labor and services.

340.    Plaintiff is entitled under 18 Pa. C. S. § 3051 to actual damages, compensatory damages, and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

341.    Plaintiff is entitled under 18 Pa. C. S. § 3051 to treble damages of actual damages because Defendants acts were willful and malicious.

342.    Plaintiff is entitled under 18 Pa. C. S. § 3051 to injunctive relief.

**SIXTH CAUSE OF ACTION**

**HUMAN TRAFFICKING**

**Pennsylvania Act 105, 18 Pa. C. S. § 3051**

(Defendants MJC, LP and Overbrook Park Holding Co.)

343.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

344.    This claim is brought under Pennsylvania Act 105, codified at 18 Pa. C. S. §§ 3001-3072.

345.    Plaintiff is authorized to bring this civil claim pursuant to the civil remedies provision of 18 Pa. C. S. §3051.

346.    Defendants MJC, LP and Overbrook Park Holding Co. knowingly benefited financially from the fact that Employer Defendants recruited and maintained Plaintiff knowing that Plaintiff would be subjected to involuntary servitude in violation of 18 Pa. C. S. § 3011.

347.    Defendants MJC, LP and Overbrook Park Holding Co. knowingly benefited financially from the fact that Employer Defendants knowingly subjected Plaintiff to involuntary servitude in violation of 18 Pa. C. S. § 3011 and 18 Pa. C. S. § 3012(a).

348.    Plaintiff is entitled under 18 Pa. C. S. § 3051 to actual damages, compensatory damages, and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

349.    Plaintiff is entitled under 18 Pa. C. S. § 3051 to treble damages of actual damages because Defendants acts were willful and malicious.

350.    Plaintiff is entitled under 18 Pa. C. S. § 3051 to injunctive relief.

## SEVENTH CAUSE OF ACTION

**Pennsylvania Minimum Wage Act of 1968 ("MWA"), 43 P.S. §§ 333.101–115**

(Defendants Carl Hemphill, Mariana Hemphill, KAH, Delco Mulch, Three Seasons, and MJC Labor Solutions)

351.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

352.   Defendants violated the MWA requirement that covered employees be compensated for every hour worked in a workweek and that they receive a minimum wage of not less than the federal minimum wage. *See* 43 P.S. §§ 333.104(a)-(a.1).

353.   Defendants also violated the MWA requirement that employees receive overtime compensation "not less than one and one-half times" the employee's regular rate of pay for all hours worked over 40 in a workweek. *See* 43 P.S. § 333.104(c).

354.   Defendants acted intentionally, willfully, and with reckless disregard of clearly applicable MWA provisions.

355.   As a consequence of the Defendants' violations of his rights under the MWA, Plaintiff is entitled to his unpaid wage, along with attorneys' fees and costs of the court, pursuant to 43 P.S. § 333.113.

## EIGHTH CAUSE OF ACTION

**Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1–260.12**

(Defendants Carl Hemphill, Mariana Hemphill, KAH, Delco Mulch, Three Seasons, and MJC Labor Solutions)

356.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

357.   The WPCL requires employers to notify employees of the rate of pay at the time of hiring, and to notify employees of a change in the pay rate prior to the time of the change. 43 P.S. § 260.4.

358.   The WPCL also requires that all wages earned by an employee be timely paid by the employer on a regularly-scheduled payday. 43 P.S. § 260.3(a).

359.   Employer Defendants failed to pay Plaintiff for any work performed in the pay period ending on Wednesday, April 22, 2015.

360.    Employer Defendants failed to pay Plaintiff all of the wages he was due in each and every pay period in 2015. Those shortages exceeded five percent (5%) of the gross wages payable to Plaintiff in each pay period.

361.    Employer Defendants withheld Plaintiff's entire pay for the period of June 18, 2015 to July 1, 2015 until after October 14, 2015. At that time, Defendants failed to pay Plaintiff more than 5% of the gross wages owed to him for that pay period.

362.    Regulations implementing the WPCL provide that deductions from wages paid to the employer are only permissible if authorized by the employee in writing or authorized by a collective bargaining agreement. 34 Pa. Code § 9.1(11).

363.    Employer Defendants' deductions from Plaintiff's wages for airfare failed to comply with these requirements of law and were impermissible deductions under the WPCL.

364.    Employer Defendants had no good faith reason for withholding any wages owed to Plaintiff.

365.    The WPCL provides that "[w]here wages remain unpaid for thirty days beyond the regularly scheduled payday, . . . or where shortages in the wage payments made exceed five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter, and no good faith contest of dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe[e] shall be entitled to claim, in addition [to the wages owed], as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars($500), whichever is greater." 42 P.S. § 260.10.

366.    As a consequences of Employer Defendants' violations of his rights under the WPCL, Plaintiff is entitled to claim unpaid wages and liquidated damages of $500 per calendar quarter pursuant to 43 P.S. §§ 260.9a-260.10.

## NINTH CASE OF ACTION
### BREACH OF CONTRACT

(Defendants Carl Hemphill, Mariana Hemphill, KAH, Delco Mulch, Three Seasons, and MJC Labor Solutions)

367.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

368.   Employer Defendants collectively entered into a contract with Plaintiff and each party's acceptance was supported by good and valuable consideration.

369.   Plaintiff fulfilled his contractual obligations by traveling to the United States and laboring for Employer Defendants.

370.   Employer Defendants breached the contract with Plaintiff by failing to pay contractually established wages for work performed by Plaintiff and to cover promised expenses.

371.   Because of Employer Defendants' breach of contract, Plaintiff suffered from a loss of expected wages and income.

372.   Plaintiff is entitled to monetary damages sufficient to place him in the financial position he would have been in but for Defendants' breach.

## TENTH CAUSE OF ACTION
### UNJUST ENRICHMENT

(Defendants Carl Hemphill, Mariana Hemphill, KAH, Delco Mulch, Three Seasons, and MJC Labor Solutions)

373.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

374.   By laboring for Employer Defendants, Plaintiff provided benefits to Defendants.

375.   Plaintiff expected to be compensated for the labor he provided to Employer Defendants. Employer Defendants' unjust failure to pay Plaintiff prevailing wages for the labor performed constituted a distinct detriment to Plaintiff.

376.   Accordingly, Plaintiff is entitled to monetary damages equal to the reasonable value of the labor provided to Employer Defendants.

## ELEVENTH CAUSE OF ACTION
### UNFAIR TRADE PRACTICES
**Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**73 P.S. §§ 201-1–201-9.2**

(All Defendants)

377.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

378.    This cause of action is brought as a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PA Unfair Trade Practices Law"), 73 P.S. §§ 201-1–201-9.2, as authorized by 73 P.S. §201-9.2.

379.    That statute authorizes claims for a period of up to six years for unfair or deceptive practices in relationship to a purchase or lease of goods or services for personal, family or household services.

380.    By deceiving Plaintiff about rental housing in which he would be living, Defendants are in violation of the PA Unfair Trade Practices Law.

381.    By the charging Plaintiff fees to live in housing that was not operated in accordance with law, and that was uninhabitable due to, among other things, overcrowding and vermin infestation, Defendants are in violation of the PA Unfair Trade Practices Law.

382.    The actions of Defendants with respect to rental housing fees are also in violation of the Consent Order for Injunctive Relief entered in *Fuentes, et al. v. MJC Labor Solutions, et al.*, No. 2:07-cv-00980-RBS (E.D. Pa., Docket 51, Nov. 3, 2009).

383.    Plaintiff is entitled to monetary damages, treble damages, and attorneys' fees and costs.


## TWELFTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

(Defendants Carl Hemphill and MJC Labor Solutions, LLC)


384.    Plaintiff Jose Enrique Castillo Chaidez re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

385.    Alternatively, Defendants Carl Hemphill and MJC Labor Solutions, LLC are liable for negligent misrepresentations made to Plaintiff in the course of his recruitment and placement to work for Defendants in the United States.

386.    Carl Hemphill, acting on behalf of MJC Labor Solutions, prepared and submitted applications for H-2B tractor-trailer truck driver employees and performed services to recruit such employees for KAH Transportes.

387.    In February 2015, Defendant Carl Hemphill, acting on behalf of MJC Labor Solutions, recruited Plaintiff to the tractor-trailer truck driver position through a job fair in Sinaloa, Mexico.

388.    In the course of that recruitment, Carl Hemphill represented to Plaintiff that the start date of his employment would be March 5, 2015, when in fact he did not start work until April 20, 2015.

389.    In the course of that recruitment, Carl Hemphill represented to Plaintiff that his job duties would only include driving a tractor-trailer truck and tarping the load, when in fact he was regularly required to perform manual labor outside of this job description.

390.    In the course of that recruitment, Carl Hemphill represented to Plaintiff that he would be paid the prevailing wage rate for all hours worked, when in fact he was not paid for many hours of work performed.

391.    In the course of that recruitment, Carl Hemphill represented to Plaintiff that his employer would arrange his transportation to the United States, but he failed to disclose that the cost of such transportation would in fact be deducted from Plaintiff's pay.

392.    In the course of that recruitment, Carl Hemphill offered Plaintiff housing. Carl Hemphill represented to Plaintiff that MJC Labor Solutions would be the owner/lessor/proprietor of the housing, when in fact he placed Plaintiff in housing owned by Defendant Overbrook Park Holding Co., Ltd.

393.    Carl Hemphill represented to Plaintiff that the housing offered would be clean and free of pests, when in fact it was filthy and infested with vermin.

394.    Each of the representations recited above in Paragraphs 388–393 were misrepresentations of material facts or contained material omissions.

395.    As H-2B recruiters, Carl Hemphill and MJC Labor Solutions owed a duty to Plaintiff to accurately represent the terms and conditions of employment.

396.    Carl Hemphill, acting on behalf of MJC Labor Solutions, failed to make a reasonable investigation into the truth of these representations, and/or made them under circumstances in which he ought to have known they were false, and/or failed to exercise reasonable care in communicating them to Plaintiff.

397.    Carl Hemphill made each of these representations with an intent to induce Plaintiff to accept the temporary H-2B employment opportunity offered to him, to the benefit of Defendants.

398.    As a result of these representations and the circumstances under which they were made, Plaintiff justifiably relied on these statements in accepting the temporary H-2B employment opportunity and traveling to the United States.

399.    As a result of such negligent misrepresentations, Plaintiff suffered injury in the form of lost income, accrued debt, emotional distress, and reputational harm.

400.    Wherefore, Plaintiff respectfully requests that this Court award compensatory and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.  Award Plaintiff monetary damages for unpaid wages and unpaid overtime in an amount to be determined at trial, plus liquidated damages in an equal amount and interest, as provided by the FLSA, 29 U.S.C. § 216(b);

2.  Award Plaintiff actual unpaid wage damages as provided in the MWA;

3.  Award Plaintiff actual unpaid wages and liquidated damages as provided in the WPCL;

4.  Find that Defendants were unjustly enriched by Plaintiff's labor and order the disgorgement of funds equal to the difference between the wages paid by Defendants and the actual value of their labor at required prevailing wage rates;

5.  Award Plaintiff damages for breach of contract;

6.  Award Plaintiff compensatory damages in an amount to be determined at trial;

7.  Award Plaintiff punitive damages for violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1595;

8.  Award Plaintiff restitution pursuant to 18 U.S.C. § 1593 in an amount to be determined at trial;

9.  Award Plaintiff treble damages for violations of Pennsylvania Act 105, 18 Pa. C. S. § 3051 in an amount to be determined at trial;

10. Award Plaintiff attorney's fees and costs pursuant to 29 U.S.C. § 216(b); 18 U.S.C. § 1595; and 18 Pa. C. S. § 3051(d);

11. Issue a permanent injunction barring Defendants from contacting Plaintiff or his family;

12. Issue a permanent injunction barring Defendants from use of the H-2B Temporary Non-Agricultural Worker Program; and

13. Grant such additional and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: July 7, 2021                    /s/ Chelsea Edwards_____
                                       Chelsea Edwards, Esq.
                                       Nancy Rimmer, Esq.
                                       Kathryn Brown, Esq.
                                       Liz Chacko, Esq.
                                       JUSTICE AT WORK
                                       990 Spring Garden St., Ste. 300
                                       Philadelphia, PA 19123
                                       215-733-0878

                                       John Grogan, Esq.
                                       Peter Leckman, Esq.
                                       LANGER, GROGAN & DIVER, P.C.
                                       1717 Arch St., Ste. 4020
                                       Philadelphia, PA 19103
                                       215-320-5660

                                       *Counsel for Plaintiff*